**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*., ) | |
| Craig Meyer; ) | |
| ) | |
| Plaintiff, ) | Case No. 17-CV-12-MWB |
| ) | |
| ) | **TO BE FILED IN CAMERA** |
| vs. ) | **UNDER SEAL** |
| ) | |
| RESMED CORP. ) | |
| ) | |
| and ) | |
| ) | |
| RESPIRONICS, INC. ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

**QUI TAM COMPLAINT FILED IN CAMERA
AND UNDER SEAL**

Qui tam Plaintiff/Relator, Craig Meyer ("Relator"), through his attorneys Brady & Associates, on behalf of the United States of America, for his Qui Tam Complaint against Defendants ResMed Corp. ("ResMed") and Respironics, Inc. ("Respironics") based upon his direct and personal knowledge, alleges as follows:

**I. INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims caused to be made by Defendants ResMed and Respironics, and/or their respective agents and employees in violation of the federal Civil False Claims Act, 31 U.S.C. § 3729, et seq., as amended ("the FCA").

2.      Since at least 2011, each of the two Defendants, in apparent competition with

each other and respectively in competition with other companies in the relevant industry, have conducted similar unlawful kickback schemes to induce Home Medical Equipment ("HME") companies to purchase the respective Defendant's continuous positive airway pressure ("CPAP") products, in violation of the federal Anti-Kickback Statute.

3.     Upon information and belief, Defendant Respironics has engaged in similar kickback schemes as described herein to induce HME companies to purchase or lease Respironics' oxygen concentrators for patients with respiratory disorders.

4.     As a direct result of each of the two Defendant's improper practices, federal health insurance programs, including but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and the Federal Employee Health Benefits Program ("FEHBP") have been caused to pay false or fraudulent claims for reimbursement of ResMed's and Respironics' CPAP equipment and supplies, as well as Respironics' oxygen concentrators, that resulted from Defendants' respective illegal kickbacks.

5.     The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.

6.     Congress intended the amendments to the FCA to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of retaliation, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

7.     The FCA provides that any person who knowingly submits, or causes the

submission of a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the false claims, plus attorneys' fees and costs. 31 U.S.C. § 3729. Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

8.    The FCA allows any person, known as a "relator," having information about a false or fraudulent claim against the Government to bring an action on behalf of the Government, and to share in any recovery.

9.    Based on these provisions, Plaintiff and Relator Craig Meyer seeks through this action to recover on behalf of the United States damages and civil penalties arising from the Defendants respectively making or causing to be made false or fraudulent records, statements and/or claims in connection with its illegal kickbacks related to ResMed's and Respironics' CPAP equipment and supplies and Respironics' oxygen concentrators.

10.    Although Defendants did not directly submit claims for the relevant durable medical equipment to federal health insurance programs, they each knew, and/or reasonably foresaw, that their respective illegal financial inducements would cause the submission of thousands of claims to these health programs for prescriptions that were not eligible for program reimbursement due to being tainted by Defendants' kickback schemes.

11.    Defendants are therefore respectively liable under the FCA and the federal Anti-Kickback Statute for causing the submission of thousands of claims for ResMed's and Respironics' CPAP equipment and supplies, as well as Respironics' oxygen concentrators, that were not eligible for reimbursement because those claims were tainted by illegal kickbacks that the Defendants provided to the HME companies.

## II.    PARTIES

12.    Relator Craig Meyer is a resident of Kansas and a citizen of the United States. Since 2006, Craig Meyer has been the owner and principle officer of Advanced Medical DME, LLC, a Kansas limited liability company that operates in Kansas, Missouri and Texas and has purchased CPAP equipment from both Defendant ResMed and Defendant Respironics. In that capacity, and through his involvement in the HME industry, Craig Meyer has gained direct and personal knowledge of the illegal kickbacks and false claims alleged herein. Relator brings this action on behalf of the United States of America pursuant to the Qui Tam provisions of the FCA, 31 U.S.C. § 3729 et seq.

13.    Defendant ResMed is a corporation organized under the laws of Minnesota with a principal place of business at 9001 Spectrum Center Boulevard, San Diego, California 92123. Defendant ResMed regularly transacts business in this federal district.

14.    Defendant Respironics is a corporation organized under the laws of Delaware with a principal place of business at 1010 Murry Ridge Lane, Murrysville, Pennsylvania 15668. Respironics is a wholly owned subsidiary of Philips Holdings USA, Inc. Defendant Respironics regularly transacts business in this federal district.

15.    Both Defendant ResMed and Defendant Respironics develop, manufacture and market a broad range of prescription CPAP equipment and supplies, including but not limited to, the following prescription products:

    A.    Continuous Positive Airway Pressure (CPAP) devices that deliver a steady flow of air throughout the night as a treatment for sleep apnea.

    B.    Bi-level therapy devices that deliver two levels of pressure during the night;

    C.    Auto therapy devices;

    D.    Humidifiers;

E.   Tubing used to carry the air from the therapy device to the mask;

F.   Therapy device filters;

G.   Masks used to deliver the air from the therapy device;

H.   Chinstraps/headgear.

Both ResMed and Respironics, respectively, sell and/or lease these products to HME companies who provide CPAP equipment and supplies to patients pursuant to a prescription. ResMed provides about 40 percent of the market share of CPAPs themselves, and about 50 percent of the market share of CPAP masks. Respironics provides about 35 percent of the market share of CPAPs themselves, and about 45 of the percent market share of CPAP masks. Respironics also sells and/or leases oxygen concentrators to HME companies who provide oxygen concentrators to patients pursuant to a prescription.

### III.   JURISDICTION AND VENUE

16.   This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

17.   In accordance with 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relator Meyer has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. In accordance with 31 U.S.C. § 3730(e)(4)(B), Relator is an original source with direct and independent knowledge of the allegations contained herein.

18.   This Court has personal jurisdiction over each of the Defendants pursuant to 28

U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because each of the two Defendants transact business in the Northern District of Iowa.

19.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because each of the two Defendants transact business in the Northern District of Iowa.

## IV.     BACKGROUND ON FEDERAL HEALTH INSURANCE PROGRAMS

### A.     Medicare Program

20.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

21.     Medicare's annual reimbursements for CPAP equipment and supplies are estimated to be $745 million.

22.     Medicare now has four parts:  Part A, Part B, Part C, and Part D.

23.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

24.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A such as "durable medical equipment" including HME equipment and supplies. Part B also helps pay for covered health services and supplies when they are medically necessary.

25.     Medicare Part C, also known as "Medicare Advantage," is a managed care program that can be utilized by Medicare beneficiaries as a replacement for benefits otherwise generally available under Medicare Parts A and B, as described above. Medicare Part C is

federally funded through contracts with private commercial insurance carriers who pay claims on behalf of Medicare beneficiaries.

26.     Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

27.     Payments from the Medicare Program come from a trust fund, known as the Medicare Trust Fund, which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

28.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

29.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

30.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with applicable rules and regulations.

31.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

32.     Under Medicare Part C (Medicare Advantage), the federal government provides funding and contracts with private insurers who provide CMS-approved managed care insurance

plans to provide health care services and supplies to Medicare beneficiaries. A Medicare beneficiary must affirmatively enroll in one of the many Medicare Advantage plans offered by private insurers to receive benefits as provided in the relevant plan in lieu of receiving benefits under Medicare Parts A and B.

33. Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

34. The principal function of both intermediaries and carriers is to make payments for Medicare services, and to audit claims for those services, to assure that federal funds are spent properly.

35. To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for that prevention, diagnosis, or treatment of a specific illness or injury.

36. Medicare Part B provides "fee for service" reimbursements for non-hospital use of "durable medical equipment" such as the claims for use of CPAP equipment and supplies, as well as oxygen concentrators, at issue in this case. Thus, the Medicare false claims at issue in this case were submitted under Part B.

**B. Medicaid Program**

37. Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical

assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

38.     Medicaid is a cooperative federal-state public assistance program which is administered by the states.

39.     Funding for Medicaid is shared between the federal government and the respective states.

40.     Title XIX of the Social Security Act allows considerable flexibility within the states' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

41.     However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

42.     Medicaid coverage for CPAP equipment and supplies varies from state to state. Upon information and belief, Medicaid programs in all states and the District of Columbia cover patients' in-home use of oxygen concentrators.

**C.     Other Federal Health Care Programs**

43.     In addition to Medicare and Medicaid, the federal government reimburses a portion of the cost of prescription medication, equipment, and supplies under several other federal health care programs, including but not limited to, TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

44.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

## V.     THE ANTI-KICKBACK STATUTE

45.     Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money and financial incentives on health care decisions.

46.     When a company pays kickbacks to a medical equipment provider, such as an HME company, in order to induce the provider to use the company's products, it fundamentally compromises the integrity of the provider/patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon health care providers to decide what treatment and/or medical equipment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program. As a condition of its reimbursement, government healthcare programs require that individuals and companies must render their services without the conflict of receipt of a kickback.

47.     The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

> (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

> (2) to purchase, lease, order, arrange for or recommend any good, facility, service,

or item covered under a Federal health care program.

42 U.S.C. §1320a-7b(b)(l) and (2).

48.     As to the Anti-Kickback Statute, "[t]he scope of prohibited conduct includes not only that which is intended to induce referrals, but also that which in intended to induce the purchasing, leasing, ordering or arranging for any good, facility, service or item paid for by Medicare or Medicaid.  61 Fed. Reg. 2122, 2124 (Final Rule, Jan. 25, 1996).

49.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U .S.C. § 1320a-7b(b)(1 ).

50.     In fact, one form or "remuneration" expressly identified as a type of kickback which prompted Congress to strengthen the Anti-Kickback Statute by, among other things, broadening the definition of covered kickbacks to encompass "any remuneration" was unduly favorable "credit arrangements[.]"   H. Rep. No. 393, Part II, 95 Cong., 1st Session 53, *reprinted in* 1997 U.S. Code Cong. & Admin. News 3039, 3048-49.

51.     The federal Anti-Kickback Statute has been interpreted by the United States Court of Appeals for the Third Circuit, as well as other federal courts, to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *See United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985).

52.     Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.  Neither actual knowledge of the prohibitions of the Anti-Kickback Statute nor specific intent to commit a violation of the Anti-Kickback Statute is required.   42 U.S.C. § 1320a-7(b)(h).

53.     A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. A party convicted under the

federal Anti-Kickback Statute may be excluded (i.e., not allowed to bill for any services rendered) from Federal health care programs. 42 U.S.C. § 1320a-7(a).

54. In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320a-7a(a).

55. HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. *See* 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection. None of the practices at issue here meet these safe harbor regulations.

56. Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

57. Claims that result from a kickback scheme are per se false because the Anti-Kickback Statute prohibits the government from paying for services or items tainted by kickbacks. No further express or implied false statement is required to render such infected claims false, and none can render the claim legitimate.

58. The FCA imposes liability where a defendant knowingly causes such tainted claims to be presented to the Medicare, Medicaid, or other government funded healthcare programs.

59. Consequently, if a party pays a kickback to induce the provision of a particular

CPAP machine and supplies, it renders false the submitter's implied or express certification of compliance that the resulting claim complies with the requirements of the Anti-kickback Statute.

60.     Moreover, on March 23, 2010, as part of the Affordable Healthcare for America Act, the Anti-Kickback Statute was amended to clarify that all claims tainted from a violation of the Anti-Kickback Statute are a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). That amendment to the Anti-Kickback Statute codified the long-standing case law that a claim tainted by a violation of the Anti-Kickback Statute renders a claim false under the FCA. See e.g., *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 235 (3d Cir. 2004); *United States v. Rogan,* 517 F.3d 449 (7th Cir. 2008).

## VI. FRAUD ALLEGATIONS

61.     Obstructive sleep apnea ("OSA") is a condition in which a person's upper airway becomes narrow as the muscles relax naturally during sleep. This reduces oxygen in the blood and results in sleep apnea and/or hypopneas. Approximately 15 million people in the United States are actively being treated for this condition.

62.     The medical treatment for OSA is positive airway pressure ("PAP"). PAP treats OSA by delivering a stream of compressed air via a hose to a nasal pillow, nose mask, full-face mask, or hybrid, splinting the airway (keeping it open under air pressure) to deliver unobstructed breathing by reducing and/or preventing apneas and hypopneas.

63.     There are two forms of equipment for the provision of PAP: CPAP (continuous positive airway pressure), and VPAP (variable positive airway pressure).

64.     Millions of Americans also suffer from respiratory ailments, such as chronic obstructive pulmonary disease ("COPD"), for which they are prescribed home oxygen therapy. Such home oxygen therapy is typically delivery through the use of durable medical equipment,

including an oxygen concentrator.

65.     Each of the two Defendant's revenue from their respective CPAP equipment product lines, as well as Respironics' revenue from its oxygen concentrators, depends upon the decisions of Respiratory Therapists and similar practitioners working at, or in conjunction with, HME companies to recommend and provide either ResMed or Respironics products to their patients, rather than products sold by one of their competitors.

66.     When a physician diagnoses a patient and prescribes the use of a CPAP machine or home oxygen therapy, that physician's prescription does not usually specify what particular manufacturer's CPAP equipment and supplies or oxygen concentrators are to be provided.

67.     A patient who receives such a prescription goes to an HME company to obtain his/her CPAP equipment and supplies or oxygen concentrator.

68.     A Respiratory Therapist or other similar medical practitioner is required to use his/her medical knowledge and judgment to determine the best CPAP equipment and supplies or oxygen concentrator for that particular patient, and makes a recommendation accordingly.  Also, and importantly, representatives of the relevant HME company can determine which manufacturer's CPAP equipment and supplies or oxygen concentrator a patient will be provided based on the most favorable financial arrangement between the HME company and a manufacturer of CPAP equipment and supplies or oxygen concentrator.

69.     The decision to recommend and provide a particular manufacturer's CPAP equipment and supplies or oxygen concentrator may not be based on any kickback or remuneration offered by a manufacturer to induce such a selection.

70.     Once a patient who is covered by Medicare or another federal health care program has received his/her initial CPAP equipment and supplies, that patient is eligible under

Medicare and other federal programs to receive replenishment supplies per Medicare guidelines (approximately every three months). These replenishment supplies include a new mask, tubing, chinstraps/headgear, and filters. Except in areas where Medicare has established competitive bidding for CPAP equipment and supplies, Medicare reimburses approximately $472.00 for these quarterly supplies, with annual reimbursement of approximately $1,890. Areas that are subject to competitive bidding generally have lower Medicare reimbursement rates.

71.     The marketplace of HME companies that provide CPAP equipment and supplies to patients in the United States generally includes two extremely large HME companies— Lincare and Apria—along with hundreds of much smaller HME companies dispersed throughout the nation, such as Advanced Medical DME, LLC, which is owned and operated by Relator Craig Meyer.  The same is generally true as to oxygen concentrators—Lincare and Apria are the two largest providers, with hundreds of smaller providers dispersed throughout the United States.

72.     To operate efficiently and effectively, such HME companies must maintain inventory of readily available CPAP equipment and supplies and/or oxygen concentrators. Maintaining such inventory of readily available CPAP equipment and supplies and/or oxygen concentrators constitutes a major expense of such HME companies which, absent an arrangement for financing such inventory, would require substantial periodic outlays of capital.

73.     Defendants ResMed and Respironics, in competition with each other and respectively in competition with other manufacturers of CPAP equipment and supplies, have arranged for HME companies routinely to receive interest-free financing, for twelve months, of substantial amounts of inventory of CPAP equipment and supplies.

74.     Defendant Respironics, in competition with other manufacturers of oxygen concentrators, has similarly arranged for HME companies routinely to receive interest-free financing, for twelve months, of substantial amounts of inventory of oxygen concentrators.

75.     Since at least 2011 and continuing through the present ResMed has arranged for HME companies, such as Advanced Medical DME, to purchase CPAP equipment and supplies in bulk from ResMed with financing provided by Wells Fargo Equipment Finance, Manufacturer Services Group.  The address for Wells Fargo Equipment Finance, Manufacturer Services Group is 300 Tri-State International, Suite 400, Lincolnshire, IL 60069.   Under such financing arrangements, the HME company would receive the entire shipment of CPAP equipment and supplies immediately from ResMed and would make interest-free monthly payments to Wells Fargo Bank, N.A., over twelve months, for the purchase price of the equipment and supplies.  The only cost to the HME company for such Wells Fargo-provided financing of the CPAP equipment and supplies from ResMed is a flat $100 "documentation fee."

76.     In addition to utilizing Wells Fargo to provide HME companies with interest-free twelve-month financing to purchase inventory of durable medical equipment, ResMed similarly utilizes a second, alternative, lending company, Navitas Lease Corp., for the same purpose with essentially the same terms for HME companies.  The address for Navitas Lease Corp. is 1719 Route 10 East,  Suite 306, Parsippany, New Jersey 07054.  The only cost to the HME company for such Navitas-provided financing of the CPAP equipment and supplies from ResMed is a flat $95 "processing fee."

77.    For example, since November of 2011 Advanced Medical DME has received financing, arranged by ResMed, from Wells Fargo for 39 bulk orders of CPAP equipment and supplies from ResMed. On each occasion of such financing, Advanced Medical DME agreed to make twelve monthly payments for the ResMed equipment and supplies to Well Fargo, with no interest assessed thereon. (On a few occasions the first of the twelve monthly payments was allowed to be delayed for two or three months). The principle amount of those 39 loans ranged from $12,522.07 to $180,870.96. In total, since November of 2011, Advanced Medical DME has received $1,651,392.14 of inventory from ResMed, with twelve monthly payments thereon to a third-party financier, Wells Fargo, completely interest free.

78.    Also, during May of 2015, Advanced Medical DME received financing, arranged by ResMed, from Navitas for a bulk order of CPAP equipment and supplies from ResMed. On that occasion of such financing, Advanced Medical DME agreed to make twelve monthly payments for the ResMed equipment and supplies to Navitas, with no interest assessed thereon. The principle amount of that loan was $33,565.16.

79.    Similarly, since at least 2011 and continuing through the present Respironics has arranged for HME companies, such as Advanced Medical DME, to purchase CPAP equipment and supplies in bulk from Respironics, with financing provided by VGM Financial Services. The address for VGM Financial Services is 1111 West San Marnan Drive, Waterloo, IA 50701. Under such financing arrangements, the HME company would receive the entire shipment of CPAP equipment and supplies immediately from Respironics and would make interest-free monthly payments to VGM Financial Services, over twelve months, for the purchase price of the equipment and supplies. The only cost to the HME company for such VGM-provided financing of the CPAP equipment and supplies from Respironics is a flat $99 "documentation fee" plus a nominal $1 "purchase option fee."

80.     A representative of Respironics has stated to Relator Meyer that Respironics engages in similar interest-free twelve month financing for HME companies to purchase or lease oxygen concentrators from Respironics.

81.     For example, since November of 2011 Advanced Medical DME has received financing, arranged by Respironics, from VGM Financial Services for 42 bulk orders of CPAP equipment and supplies from Respironics.  On each occasion of such financing, Advanced Medical DME agreed to make twelve monthly payments for the Respironics equipment and supplies to VGM Financial Services, with no interest assessed thereon.  The principle amount of those 42 loans ranged from $21,932.46 to $158,904.35.  In total, since November of 2011, Advanced Medical DME has received $2,357,129.47 of inventory from Respironics, with twelve months of payments thereon to a third-party financier, VGM Financial Services, completely interest free.

82.     There was nothing unique about Advanced Medical DME as a provider of CPAP equipment and supplies, or its business relationship with either ResMed or Respironics, to suggest that such interest-free financing of inventory was not a standard practice of both ResMed and Respironics in their respective dealings with HME companies generally.  Moreover, on at least one occasion a sales representative of Respironics with whom Relator Meyer had developed a business relationship over the years stated to Relator Meyer that Respironics' provision of interest-free financing of inventory to Advanced Medical DME was standard practice for Respironics vis-a-vis HME companies.

83.     One purpose of ResMed's financial inducements to HME companies in the form of interest-free loans to finance inventory of CPAP equipment and supplies was to induce HME companies to provide their patients with ResMed's CPAP equipment and supplies.

84.    ResMed knew, or absent reckless indifference should have known, that HME companies receiving such financial inducements to purchase or lease ResMed's CPAP equipment and supplies or oxygen concentrators would receive reimbursements for such equipment and supplies from Medicare, Medicaid, and other federal healthcare programs.

85.    ResMed's provisions of these financial inducements to HME companies in an effort to induce them to provide their patients with ResMed CPAP equipment and supplies were therefore violations of the Anti-Kickback Statute.

86.    One purpose of Respironics' financial inducements to HME companies in the form of interest-free loans to finance inventory of CPAP equipment and supplies, or to finance inventory of oxygen concentrators, was to induce HME companies to provide their patients with Respironics' CPAP equipment and supplies or oxygen concentrators.

87.    Respironics knew, or absent reckless indifference should have known, that HME companies receiving such financial inducements to lease or purchase Respironics' CPAP equipment and supplies or oxygen concentrators would receive reimbursements for such equipment and supplies from Medicare, Medicaid, and other federal healthcare programs.

88.    Respironics' provisions of these financial inducements to HME companies in an effort to induce them to provide their patients with Respironics' CPAP equipment and supplies or oxygen concentrators was therefore a violation of the Anti-Kickback Statute.

89.    ResMed's revenue from its CPAP business depends heavily upon HME companies putting their patients on ResMed's CPAP equipment and supplies. The medical providers working for, or in conjunction with, the HME companies have a large influence over which manufacturer's CPAP equipment and supplies or oxygen concentrators a patient will use.

90.    Respironics' revenue from its CPAP and oxygen concentrator business depends

heavily upon HME companies putting their patients on Respironics' CPAP equipment and supplies or oxygen concentrators. The medical providers working for, or in conjunction with, the HME companies have a large influence over which manufacturer's CPAP equipment and supplies or oxygen concentrators a patient will use.

91.     Each of the two Defendants knowingly and willfully offered and provided valuable remuneration in the form of interest-free financing of inventory to HME companies to induce them to put their patients on the respective Defendant's CPAP equipment and supplies or oxygen concentrators.

92.     When each of the Defendants intentionally decided to employ these illegal kickbacks to promote the purchase or lease of their respective durable medical equipment, each Defendant respectively knew or should have known that the HME companies receiving those inducements would routinely file kickback-tainted, and therefore false, claims for reimbursements from health insurance programs funded by the federal government when they sought federal reimbursement for such kickback-tainted durable medical equipment.

93.     Because such claims are not eligible for federally funded reimbursement, submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729.  Those who knowingly cause such false claims to be filed, as the Defendants have through their illegal kickback practices, are liable under the FCA, 31 U.S.C. § 3729.

94.     Each of the two Defendants knew, or absent reckless disregard should have known, that claims resulting from kickbacks were not eligible for federal program reimbursement. Notwithstanding such knowledge or recklessness, each of the two Defendants knowingly undertook such illegal kickback practices to increase the HME companies' provision

of ResMed's or Respironics' CPAP products and Respironics' oxygen concentrators to their patients.

95.    Each of the two Defendants' illegal kickbacks schemes therefore caused the submission of false or fraudulent claims to federal health insurance programs.

96.    Each of the two Defendants substantially benefitted from all of the false and fraudulent claims described herein.

97.    The submission of false claims was not only foreseeable, but was one of the intended results of each of the two Defendants' illegal kickback schemes.

## Count I

### Federal False Claims Act
### 31 .S. C. §§ 3729(a)(l) and (a)(2)

98.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

99.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S. C. § 3729, et seq., as amended.

100.    By virtue of the acts described above, each of the two Defendants knowingly caused false or fraudulent claims to be made to federally-funded health care programs.

101.    By virtue of the acts described above, each of the two Defendants knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Government, or third-party intermediaries, to approve or pay such false and fraudulent claims.

102.    Each of the two Defendants provided illegal remuneration to HME companies in the form of arranging for interest-free loans to induce improper recommendations and provision of their respective CPAP equipment and supplies, and Respironics' oxygen concentrators, to beneficiaries of federally-funded health care programs in violation of the federal Anti-Kickback

Statute.

103. Claims that arise from Defendants' respective kickback schemes are false, and violate the FCA, because they are the tainted by kickbacks—no further express or implied false statements are required to render such kickback-tainted claims false, and none can render the claims legitimate.

104. Each of the two Defendants' violations of the federal Anti-kickback Statute give rise to liability under the FCA for causing false claims for reimbursements for the kickback-tainted items.

105. Each of the two Defendants violated the FCA by causing to be submitted claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that those claims would be ineligible for the payments demanded due to federal Anti-Kickback Statute violations associated with illegal remuneration paid to HME companies.

106. Each provision of ResMed CPAP equipment and supplies that occurred as a result of the Defendant ResMed's illegal inducements represents a false or fraudulent record or statement.

107. Each provision of Respironics CPAP equipment and supplies or oxygen concentrators that occurred as a result of the Defendant Respironics' illegal inducements represents a false or fraudulent record or statement.

108. Each claim for reimbursement for ResMed's CPAP equipment and supplies submitted to a federal health insurance program resulting from illegal inducements represents a false or fraudulent claim for payment under the FCA.

109. Each claim for reimbursement for Respironics' CPAP equipment and supplies or oxygen concentrators submitted to a federal health insurance program resulting from illegal

inducements represents a false or fraudulent claim for payment under the FCA.

110. Relator Meyer cannot at this time identify all of the false claims for payment that were caused by each of the two Defendant's conduct. The false claims were presented by hundreds of separate entities, HME companies as described herein, across the United States.

111. The Government, or the relevant third-party intermediaries, unaware of the falsity of the records, statements and claims made or caused to be made by respective Defendants, paid the claims that were non-payable as a result of Defendants' illegal kickbacks, and that were therefore false under the FCA.

112. By reason of the Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial. Federal health insurance programs have paid many tens of thousands of claims, amounting to millions of dollars, for the provision of ResMed's and Respironics' CPAP equipment and supplies, and Respironics' oxygen concentrators that were illegally induced by the respective Defendants.

## PRAYER FOR RELIEF

WHEREFORE, qui tam Plaintiff and Relator Craig Meyer prays for judgment against each of the two Defendants as follows:

**To the United States**:

(1) Three times the amount of actual damages which the United States has sustained, or three times the amount of improperly received payments, as a result of each of the Defendants' conduct;

(2) A civil penalty of no less than $5,500 and up to $11,000 for each false claim which each of the Defendants caused to be presented to the United States;

(3) Prejudgment interest;

(4) All costs incurred in bringing this action; and

(5) Such further relief as this Court deems equitable and just.

**To qui tam Plaintiff and Relator Meyer:**

(1) The maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator Meyer incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>**DEMAND FOR A JURY TRIAL**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**ROUSE LAW PC**

By: *  /s/Ward A. Rouse                    *
Ward A. Rouse, IA # AT0006841
4940 Pleasant Street
West Des Moines, IA  50266
(515) 223-9000
(866) 223-9005 *(Facsimile)*
wardrouse@rouselaw.us

**ATTORNEY FOR PLAINTIFF/RELATOR**

**And**

**BRADY & ASSOCIATES**

By: *  /s/Mark A. Kistler                    *
Mark A. Kistler, KS #17171
*(pro hac vice to follow unsealing of case)*
Michael F. Brady, KS #18630
*(pro hac vice to follow unsealing of case)*

10985 Cody Street, Suite 135
Overland Park, KS  66210
(913) 696-0925
(913) 696-0468 *(Facsimile)*
mkistler@mbradylaw.com
brady@mbradylaw.com

**ATTORNEYS FOR PLAINTIFF/RELATOR**